1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10

11   TERRY ORONA, on behalf of        )    Case No. EDCV 08-1183 JC
     minor M.S.R.,                     )
12                                     )
                   Plaintiff,          )    MEMORANDUM OPINION
13                                     )
              v.                       )
14                                     )
                                       )
15   MICHAEL J. ASTRUE,                )
     Commissioner of Social            )
16   Security,                         )
                                       )
17                 Defendant.          )
     ─────────────────────────────
18

19   **I.    SUMMARY**

20          On September 17, 2008, Terry Orona ("plaintiff's mother"), as the guardian

21   ad litem for minor child M.S.R. ("plaintiff"), filed a Complaint on behalf of

22   plaintiff, seeking review of the Commissioner of Social Security's denial of an

23   application for benefits.  The parties have filed a consent to proceed before a

24   United States Magistrate Judge.

25          This matter is before the Court on the parties' cross motions for summary

26   judgment, respectively ("Plaintiff's Motion") and ("Defendant's Motion").  The

27   Court has taken both motions under submission without oral argument.  See Fed.

28   R. Civ. P. 78; L.R. 7-15; September 23, 2008 Case Management Order ¶ 5.

Based on the record as a whole and the applicable law, the decision of the Commissioner is AFFIRMED. The findings of the Administrative Law Judge ("ALJ") are supported by substantial evidence and are free from material error.[1]

## II. CHILDHOOD DISABILITY CLAIMS – SEQUENTIAL EVALUATION PROCESS

"An individual under the age of 18 shall be considered disabled if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C)(i); see also Howard ex rel. Wolff v. Barnhart, 341 F.3d 1006, 1013 (9th Cir. 2003).  In assessing whether a child is disabled, the Commissioner conducts a three-step sequential evaluation process:

> (1) Is the child engaged in substantial gainful activity?  If so, the claimant is not disabled.  If not, proceed to step two.
>
> (2) Is the child's impairment or combination of impairments severe?  If not, the claimant is not disabled.  If so, proceed to step three.
>
> (3) Does the child's impairment or combination of impairments meet, medically equal, or functionally equal an impairment in the Listing of Impairments ("Listing") described in 20 C.F.R. Part 404, Subpart P, Appendix 1?  If so, the claimant is disabled.  If not, the claimant is not disabled.

20 C.F.R. § 416.924(a).

---

[1]The harmless error rule applies to the review of administrative decisions regarding disability.  See Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1196 (9th Cir. 2004) (applying harmless error standard); see also Stout v. Commissioner, Social Security Administration, 454 F.3d 1050, 1054-56 (9th Cir. 2006) (discussing contours of application of harmless error standard in social security cases).

A claimant "meets" a listed impairment if his impairments match those described in a Listing. 20 C.F.R. § 416.925(c). A claimant "medically equals" a listed impairment if he demonstrates medical findings related to his own impairments that are of equal medical significance to the listed one. 20 C.F.R. § 416.926(b).

To determine whether a child's impairments functionally equal a Listing, the ALJ must evaluate how the child's limitations affect six broad areas of functioning, called "domains." See 20 C.F.R. § 416.926a. The domains are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi). A claimant "functionally equals" a Listing where "marked" limitations exist in two domains of functioning, or an "extreme" limitation exists in one domain. 20 C.F.R. § 416.926a(a).[2]

## III. BACKGROUND AND SUMMARY OF ADMINISTRATIVE DECISION

On November 21, 2003, plaintiff's mother, on behalf of plaintiff, filed an application for Supplemental Security Income benefits. (Administrative Record

---

[2]As used in the functional equivalency determination, a limitation is "marked" if the impairment interferes seriously with the ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2)(i). It is the equivalent of the functioning found on standardized testing with scores that are at least two, but less than three, standard deviations below the mean. Id. A limitation is "extreme" if the impairment interferes very seriously with the ability to initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(3)(i). It is the equivalent of the functioning found on standardized testing with scores that are at least three standard deviations below the mean. Id. A "marked" or "extreme" limitation may be assessed even though the test score is slightly higher than the level provided in paragraph (e)(2) or (e)(3) of this section, if other information in the record shows that functioning in day-to-day activities is seriously or very seriously limited because of the impairment. 20 C.F.R. § 416.926a(e)(4)(ii)(A). On the other hand, a finding of "marked" or "extreme" limitation is not necessary, even if the test score is at the level provided in paragraph (e)(2) or (e)(3) of this section, if other information in the record shows that functioning in day-to-day activities is not seriously or very seriously limited by the impairment. 20 C.F.R. § 416.926a(e)(4)(ii)(B).

3

1 ("AR") 68-70). Plaintiff's mother asserted that plaintiff became disabled on
2 January 28, 1993, and that he suffers from a learning disability, a loss of memory
3 disability, attention deficit hyperactivity disorder ("ADHD"), and behavior
4 changes. (AR 68, 91). The ALJ examined the medical record and heard testimony
5 from plaintiff (who was represented by counsel) and plaintiff's mother on October
6 18, 2006. (AR 371-93).

7 On December 28, 2006, the ALJ determined that plaintiff was not disabled
8 through the date of the decision. (AR 9-26). Specifically, the ALJ found:
9 (1) plaintiff has not engaged in substantial gainful activity at any relevant time
10 (AR 15); (2) plaintiff suffers from the following severe impairments: asthma and
11 ADHD (AR 15); (3) plaintiff does not suffer from an impairment or combination
12 of impairments that meets, medically equals, or functionally equals one of the
13 listed impairments[3] (AR 17); (4) plaintiff has not been disabled since the
14 application was filed (AR 26); and (5) plaintiff's statements concerning the
15 intensity, persistence, and limiting effects of his symptoms were not entirely
16 credible (AR 17).

17 The Appeals Council denied plaintiff's application for review. (AR 4-6).
18 **IV.   FACTS**
19     **A.   Medical Evidence**
20 On November 30, 1999, Dr. Linkhart, a school psychologist to whom the
21 Individual Education Program ("IEP") Team referred plaintiff due to academic
22 concerns, conducted a psychological evaluation of plaintiff and reported the
23 following:[4] Plaintiff, who was then in the first grade, was functioning in the
24
25
26     [3]As to the six "domains," the ALJ determined that plaintiff has less than marked
limitations in all such domains, *i.e.*, acquiring and using information, attending and completing
27 tasks, interacting and relating with others, moving about and manipulating objects, caring for
himself, and health and physical well being. (AR 19-25).
28
    [4]Dr. Linkhart also briefly observed plaintiff in class on November 22, 1999 and noted that
plaintiff was "fidgety" in class. (AR 167).

4

average range for nonverbal intellectual ability, visual-motor integration and visual memory skills. (AR 164). He was at the kindergarten level in reading and written language, and at the beginning first grade level in arithmetic. (AR 164). His auditory memory and discrimination skills were significantly below average. (AR 164). Plaintiff displayed a learning disability related to impaired auditory memory and discrimination and a significant discrepancy between nonverbal intellectual ability and achievement in reading. (AR 165). Plaintiff displayed a moderate discrepancy between ability and achievement in written language. (AR 165).

On March 3, 2000, plaintiff's treating physician, Dr. Oliverio, completed a child assessment for plaintiff which reflects: Plaintiff, who was then in the 1st grade, had normal development in school progress, peer relationships, hobbies, and sports. (AR 212).

On September 17, 2001, school psychologist Dr. Linkhart reevaluated plaintiff and prepared another report which reflects the following:[5] Plaintiff displayed average range functioning in nonverbal intellectual ability, below average functioning in reading, solidly average functioning in math, and was well below average functioning in written production. (AR 181). He tested in the average range for visual motor integration skills, but the quality of his test response was poor. (AR 181). He displayed significantly below average functioning in auditory memory and discrimination skills. (AR 182). His visual memory skills were in the high average range. (AR 182).

On October 1, 2002, Dr. Oliverio completed assessments for plaintiff which reflect: Plaintiff, who was then in the 4th grade, had problems in school and possibly had ADD. (AR 207). His development was normal in school progress,

---

[5]Dr. Linkhart also briefly observed plaintiff in class on September 5, 2001 and noted that plaintiff appeared to be normal, adequate and average in virtually all respects, except that repetition was needed for him to follow directions. (AR 184).

peer relationships, hobbies, and sports. (AR 207). No (physical) developmental problem was suspected. (AR 248).

On November 7, 2003, treating physician Dr. Webb prepared a brief letter which reflects: Plaintiff has a documented learning disability in the areas of auditory discrimination and auditory memory with a significant discrepancy between nonverbal intellectual ability and achievement in reading. (AR 291, 363). He exhibited most of the behaviors of ADHD and probably only got about 30% of any direction or explanation he heard. (AR 291, 363). Plaintiff had a chronic condition which had a guarded to poor prognosis that severely disabled him. (AR 291, 363).

On February 4, 2004, consultative examining psychologist, Dr. Taylor, performed a psychological evaluation of plaintiff. (AR 255-60). After administering multiple tests, conducting a complete psychological examination, and reviewing plaintiff's medical records, Dr. Taylor reported: Plaintiff was not a credible participant in the examination and attempted to be "faking bad" cognitive impairment. (AR 259). His current and past teachers did not believe that he should be in a Special Day Class ("SDC"). (AR 259). Psychoeducational testing reflected average to low average academic abilities. (AR 259). He had presented himself to Dr. Taylor as moderately to profoundly mentally retarded, which was inconsistent with his daily functioning, presentation, vocabulary and abilities. (AR 259). Plaintiff's ability to understand and respond to increasingly complex requests was not impaired. (AR 259). He had no limitations in the ability to communicate through understanding and verbalization. (AR 259). He had no developmental and social delays and needed no ongoing supervision. (AR 259). Relating to authority figures, peers and family members presented no difficulties for him. (AR 259). His ability to respond to academic and social stimuli was age appropriate. (AR 259). His developmental learning reflected no impairment in his ability to process verbal and visual information. (AR 259). His ability to engage

6

in and sustain activity for a normal period of time was not impaired due to cognitive deficits. (AR 259). His ability to maintain a normal pace was not impaired. (AR 259).

On or about February 19, 2004, Dr. Paxton, a non-examining reviewing physician, adopted the opinion that plaintiff's condition was severe, and that it did not meet, equal or functionally equal a listing. (AR 261).

On May 24, 2004, school psychologist Dr. Michaelson observed plaintiff in a classroom setting for twenty minutes and noted the following: Plaintiff's language skills, response to the environment, and organization were adequate, and his activity level was normal. (AR 272). With respect to peer interaction, plaintiff was aggressive and sought attention. (AR 272). With respect to adults/authority, plaintiff was friendly and sought attention, but needed reinforcement. (AR 272). His on-task behavior and motivation were variable and he was socially immature. (AR 272). He had a short attention span, was distractible, and was highly impulsive. (AR 272). With respect to following directions, plaintiff first observed others and needed repetition. (AR 272). His motor skills were clumsy. (AR 272). Plaintiff appeared on task much of the time, but frequently would shift, without finishing, from one task to another. (AR 272).

On May 24, 2004, school psychologist Dr. Michaelson observed plaintiff in a classroom setting for twenty minutes and noted the following: Plaintiff's language skills, response to the environment, and organization were adequate, and his activity level was normal. (AR 272, 309). With respect to peer interaction, plaintiff was aggressive and sought attention. (AR 272, 309). With respect to adults/authority, plaintiff was friendly and sought attention, but needed reinforcement. (AR 272, 309). His on-task behavior and motivation were variable and he was socially immature. (AR 272, 309). He had a short attention span, was distractible, and was highly impulsive. (AR 272, 309). With respect to following directions, plaintiff first observed others and needed repetition. (AR 272, 309).

7

His motor skills were clumsy. (AR 272, 309). Plaintiff appeared on task much of the time, but frequently would shift, without finishing, from one task to another. (AR 272, 309).

Also on May 24, 2004, Dr. Michaelson performed a psycho-educational assessment of plaintiff, the results of which are contained in a report dated June 2, 2004. (AR 294-99 [Exhibit 9F at 1-6). Dr. Michaelson reported: Plaintiff was reading at a 3rd grade level, but comprehending at an early 2nd grade level. (AR 296-97). He was functioning at an early 3rd grade written language level, which was low average for his age level. (AR 297). He was in the low average range for math, an area of relative strength. (AR 297). In sum, he had high average scores for non-language thinking skills, but his language-based potential was estimated to be considerably less dependable. (AR 299). His achievement scores for written language were well below ability levels, and his reading comprehension scores were at a borderline, "slow-learner" range, significantly below his ability profile. (AR 299). The impact of his learning disability was clearly established for auditory memory retention and retrieval where language content – sentences or words – was involved. (AR 299). His memory for numbers remained reasonably intact. (AR 299).

On July 15, 2004, Dr. Meyer, a non-examining reviewing physician opined: Plaintiff's learning disability and asthma were severe but did not meet, medically equal or functionally equal the listings. (AR 310-11).

On August 17, 2004, non-examining reviewing psychiatrist Dr. O'Malley, affirmed Dr. Meyer's opinion. (AR 310-11, 315).

On February 14, 2005, consultative examining psychologist, Dr. Taylor, performed another psychological evaluation of plaintiff. (AR 320-25). After administering multiple tests, conducting a complete psychological examination, and reviewing specified medical records, Dr. Taylor reported: Plaintiff presented as a "typical factitious responder" and consideration of malingering was given due

to a failed Rey-15 test (a technique for evaluating a claimant's cooperation and testing the validity of a memory complaint) and marked discrepancy between current IQ test scores and those obtained on the psychoeducational evaluation completed at his school. (AR 324). There was no evidence of impairment in plaintiff's ability to understand and follow instructions, function in a classroom setting, or relate to peers or adults. (AR 324). His ability to respond to stimuli and maintain concentration, persistence and pace was unimpaired. (AR 324).

On or about March 8, 2005, non-examining reviewing psychiatrist Dr. Hurwitz opined: Plaintiff's ADHD was severe but did not meet, medically equal or functionally equal the listings. (AR 328-29, 334-35). Plaintiff had less than marked limitations in all six domains. (AR 330-31). Dr Hurwitz explained that plaintiff had been noted to be malingering in February 2004 and February 2005 (presumably referring to Dr. Taylor's reports) and had no marked domain dysfunction. (AR 328).

On May 26, 2006, Dr. Paxton, a reviewing psychiatrist, adopted Dr. Hurwitz's opinion. (AR 328-29).

An undated unsigned Childhood Disability Evaluation Form reflects the following: Plaintiff suffers from a learning disability which is severe but does not meet, medically equal, or functionally equal the listings. (AR 249). As to the six domains, plaintiff has less than marked limitations in acquiring and using information and no limitations in attending and completing tasks, interacting and relating with others, moving about and manipulating objects, caring for himself or in health and physical well-being. (AR 252). As to the first domain, the evaluator noted that plaintiff was not in special education and was a "day learning skills-pull out," that both plaintiff's teacher and specialist did not believe his problems were serious enough to warrant SDC placement, but that plaintiff's mother insisted. (AR 251). The evaluator also noted that a prior denial of benefits by an ALJ showed that plaintiff was only one grade level below normal, that teacher's

information showed that he was doing well and had problems expressing himself in written form only, that his test scores were invalid with malingering suspected, that previous tests showed that he was reading at 3rd grade level, doing math at 4th grade level, and spelling at 2nd grade level, whereas current testing showed poor effort and less than preschool in all areas. (AR 254).

**B.    IEP Reports/Plaintiff's Teacher's Statements**

On November 22, 1999, plaintiff's first grade teacher reported:  Plaintiff was functioning below expectations in all language arts areas and several math standards. (AR 166).  He was classified as a "non-reader" and his memory seemed to be an issue. (AR 166).  He distracted very easily and could be a distraction to those around him. (AR 166).

On September 17, 2001, plaintiff's third grade teacher reported:  Plaintiff frequently had to be reminded to work and tended to dream a lot. (AR 183).  He was easily distracted when reading and did not comprehend "why" something happened. (AR 183).  He could write on his own but had to be prompted frequently. (AR 183).  He got along well with peers but was easily distracted. (AR 183).  He appeared oblivious to what was going on around him in a class setting. (AR 183).  He had made progress in reading. (AR 183).

On February 28, 2002, when plaintiff was in 3rd grade, the principal of plaintiff's school advised plaintiff's mother that plaintiff was demonstrating minimum levels of proficiency in the areas of reading, writing and math. (AR 292).  A report regarding plaintiff's grades for March 1, 2002 reflect:  Plaintiff was reading at a second grade level. (AR 293).  He lacked the ability to stay focused and was frequently stopping to see what was going on behind him, losing track of where he was in the book and what he had already read. (AR 293).  He could not stay on task for more than 30 seconds and needed constant prompting to start and finish work in a timely manner. (AR 293).

///

An IEP Annual Review for plaintiff dated September 9, 2003, reflects: Plaintiff was reading at a 3rd grade level, doing math at a 4th grade level and writing at a mid-2nd grade level. (AR 170, 175, 275, 280). He was able to express his needs and wants, got along well with his peers, and exhibited leadership skills. (AR 170, 275). His physical skills were age appropriate and he took care of his personal needs independently. (AR 170, 275). He liked to do skateboarding, play videogames and draw in his free time. (AR 170, 275). He wore glasses, and his attendance had improved. (AR 170, 275). In summary, plaintiff's basic skills (a combined measure of reading, writing and mathematics skills) were in the low average range. (AR 175, 280).

On December 5, 2003, plaintiff's 5th grade teacher reported: Plaintiff was reading at a 3rd grade level, doing math at a 4th grade level, and writing at a 3rd grade level. (AR 283). He had an unusual degree of absenteeism and at times was allowed to stay home for any little thing. (AR 283). In terms of the six domains, plaintiff demonstrated no disability related problems attending and completing tasks, and no problems moving about and manipulating objects or caring for himself. (AR 285, 287, 288). With respect to acquiring and using information, plaintiff demonstrated (a) no problems comprehending oral instructions, understanding vocabulary, or understanding and participating in class discussions; (b) slight problems reading and comprehending written material, comprehending and doing math problems, providing organized oral explanations and adequate descriptions, learning new material, recalling and applying previously learned material, and applying problem-solving skills in class discussions; and (c) an obvious problem in expressing ideas in written form. (AR 284). In the teacher's opinion and the previous specialist's opinion, plaintiff's needs were not serious enough to warrant SDC placement, but his mother insisted. (AR 284). With respect to interacting and relating with others, plaintiff demonstrated only slight problems playing cooperatively with other children, making and keeping friends,

and following rules, but otherwise displayed no problems. (AR 286-87). With respect to medical conditions and medications/health and physical well-being, the teacher noted that plaintiff was not on any medication, but frequently missed school due to illness. (AR 289).

On May 25, 2004, plaintiff's 5th grade teacher reported: Plaintiff was in higher groups in both reading and math. (AR 273). His reading was about mid third, but his writing lagged due to lack of application. (AR 273). He had done all operations with fractions but was careless. (AR 273). His writing tended to be run-ons. (AR 273). His school behavior was good but he was sneaky and loved to irritate his peers and run. (AR 273). His progress/strengths were great given his poor attendance. (AR 273).

On June 8, 2004, plaintiff's teacher reported: Plaintiff (a) very often was inattentive, was easily distracted, was restless in the "squirmy" sense, forgot things he had already learned, had difficulty waiting his turn, only paid attention to things he was really interested in, was distractible/had an attention span problem, and was excitable/impulsive; (b) often disturbed other children, fidgeted, did not read up to par, had a short attention span, lacked interest in school work, interrupted others, had difficulty playing quietly, and was restless; and (c) occasionally was defiant, acted as if driven by a motor, was poor in spelling, could not remain still, was spiteful or vindictive, left his seat in class, argued with adults, displayed unpredictable behavior, inappropriately ran about, was poor in math, failed to finish things he started, and did not follow through on instructions or failed to finish his school work. (AR 308).

A June 8, 2004 IEP 3 Year Review for plaintiff in which Dr. Michaelson participated, reflects: Plaintiff was reading at a 3rd grade level, comprehending at a 2nd grade level, doing math at a 4th grade level and writing at a 3rd grade level. (AR 302). He got along well with his peers, and exhibited leadership skills. (AR 302). His physical skills were age appropriate and he took care of his personal

needs independently. (AR 302). He liked to do skateboarding, play videogames and draw in his free time. (AR 302). He wore glasses, and his attendance had improved. (AR 302). Results from plaintiff's testing documented learning disability in the area of longer-term auditory memory/attention. (AR 306). Scores also evidenced strong/average non-language thinking skills, with achievement scores for reading comprehension and written language lagging significantly behind. (AR 306). Also noted were multiple reports that plaintiff's problems with focusing sustained attention represent an obstacle to classroom success greater than problems with memory. (AR 306).

On January 27, 2005, plaintiff's 6th grade teacher reported: She taught plaintiff for approximately eight weeks, prior to plaintiff going on a home school program. (AR 144). Plaintiff had approximately a third grade reading level, a fourth grade math level, and a fourth grade written language level. (AR 144). He averaged 1-2 absences a week. (AR 144). After the teacher called plaintiff's home regarding his absences, plaintiff's mother applied for home schooling. (AR 144). In terms of the six domains, plaintiff demonstrated no problems acquiring and using information, moving about and manipulating objects, or caring for himself. (AR 145, 148, 149). With respect to attending and completing tasks, plaintiff demonstrated (a) no problems paying attention when spoken to directly, sustaining attention during plays/sports activities, carrying out single and multi-step instructions, waiting to take turns, organizing things, or working at a reasonable pace/finishing on time; (b) slight problems refocusing to task when necessary, changing from one activity to another without being disruptive, and completing work accurately without caraeless mistakes; and (c) obvious problems focusing long enough to finish assigned activities/tasks, completing class/homework assignments, and working without distracting himself or others. (AR 146). With respect to interacting and relating with others, plaintiff demonstrated only slight problems playing cooperatively with other children and

13

following rules, but otherwise displayed no problems. (AR 146-47). With respect to medical conditions and medications/health and physical well-being, the teacher noted only that she did not know if plaintiff's absences were "illness" related. (AR 150).

An IEP Annual Review for plaintiff dated October 18, 2006, reflects: Plaintiff was reading at a 2nd grade level, doing math at a 2nd grade level, and writing at a 1st grade level. (AR 355). He communicated well with adults and peers, was cooperative and helpful in the classroom, had legible handwriting, took care of personal needs independently, and was developing appropriate vocational skills. (AR 355).

## C. Plaintiff's Mother's Statements

In conjunction with plaintiff's application for benefits, plaintiff's mother completed multiple function/disability reports and testified at the administrative hearing.

In a function report dated November 4, 2003, plaintiff's mother reported: Plaintiff used glasses or contact lenses. (AR 102). He did not have problems hearing. (AR 102). He was able to talk and could be understood both by people who knew him and people who did not know him well some of the time. (AR 103). He had a very difficult time trying to say the words or sentences that he needed to explain something. (AR 103). His ability to communicate was limited, and his ability to progress in learning was limited. (AR 104, 105). Although he was in 5th grade, his reading and writing level were about that of a 3rd grader. (AR 105). His physical abilities were limited in that he could not use roller skates or roller blades and could not swim. (AR 106). He could, however, walk, run, throw a ball, ride a bike, jump rope, use scissors, work video game controls and dress/undress dolls/action figures. (AR 106). His impairments affected his behavior with other people, though he had friends of his own age, could make new friends, and generally got along with his mother, teachers, and other adults. (AR

107).  His impairments affected his ability to help himself and to cooperate with others in taking care of his personal needs.  (AR 108).  His ability to pay attention and to stick with tasks was limited.  (AR 109).  He was unable to keep busy on his own, to finish things he started, to complete homework or chores most of the time, or to work on arts and crafts projects.  (AR 109).

In disability reports dated November 4, 2003 and November 21, 2003, plaintiff's mother reported:   Plaintiff suffered from a learning disability, loss of memory disability, ADHD, behavioral changes which required him to be in special education all day, and low motor skills.  (AR 91, 112).  He got very frustrated because of his inability to concentrate and forgot daily tasks very easily.  (AR 91, 112).  At birth, on January 28, 1993, plaintiff lost a lot of oxygen, which caused him to have a bad memory and low motor skill functioning.[6]  (AR 99).

In a disability report dated December 20, 2004, plaintiff's mother reported: Plaintiff had ADHD.  (AR 135).  He was very "hyper" and did not get along with family members.  (AR 135).  His memory was impaired.  (AR 135).  He got very frustrated because he could not do his school work and forgot what he had just learned that day.  (AR 135).  His teachers said that he would not remain seated and that he kept getting out of his seat and roaming around.  (AR 135).  Plaintiff displayed no other symptoms.  (AR 135).

In a function report dated December 3, 200_ (sic), plaintiff's mother reported:   Plaintiff used glasses or contact lenses and had a hearing loss but had not been prescribed hearing aids.  (AR 81).  He had problems talking clearly, could be understood by people who knew him well some of the time, and could hardly ever be understood by people who did not know him well.  (AR 82).  His ability to communicate was limited, and his ability to progress in learning was

_____

[6]An undated child health history form reflects that plaintiff's mother did not have a difficult or abnormal delivery and that plaintiff did not have any problems the first week of his life.  (AR 269).

15

limited. (AR 83, 84). His physical abilities were not limited. (AR 85). His impairments affected his behavior with other people, though he had friends of his own age and generally got along with his mother, teachers, and other adults. (AR 86). His impairments affected his ability to help himself and to cooperate with others in taking care of his personal needs. (AR 87). His ability to pay attention and to stick with tasks was limited. (AR 88). Although he was able to keep busy on his own and to work on arts and crafts projects, he could not finish things he started, complete homework or complete chores most of the time. (AR 88).

In a disability report dated May 27, 2005, plaintiff's mother reported: Plaintiff was getting further behind on school tasks due to his illness and mobility skills. (AR 152). He was very "hyper" and did not seem to get along well with his peers or siblings due to his actions, behavior, and slow motor skills. (AR 155). Dr. Webb reported on plaintiff's condition. (AR 155). Plaintiff's counselors told plaintiff's mother that plaintiff was two grades behind due to his ADHD. (AR 155). Plaintiff's speech was "not so clear," so that he had difficulty trying to explain himself. (AR 155). At birth, plaintiff lost a lot of oxygen and was born with the umbilical cord around his neck.[7] (AR 155).

At the administrative hearing, plaintiff's mother testified: Plaintiff stopped going to school because he got really sick. (AR 379). He was missing a lot of school. (AR 379). One of the reasons was that he was afraid of going to school because he was getting picked on a lot. (AR 379). He got panic attacks. (AR 379). The other reason was his asthma. (AR 379). Plaintiff dropped out of middle school in seventh grade and finished it at home. (AR 379). The doctors, plaintiff's counselor, and the principal decided to have him drop out of school and placed on home study. (AR 380-81). The school counselor told plaintiff it would be better for him to leave school because he was constantly getting the teachers

---

[7]See supra note 6.

and the kids sick. (AR 381). Plaintiff had disciplinary problems at school. (AR 381). He was either messing around with kids, wasn't sitting down in his seat, or wouldn't do his work. (AR 381). Sometimes he was in fights. (AR 381). He was picked on and was called retarded and got in fights with the mainstream kids and the kids in special education classes. (AR 382). With each passing year, plaintiff's condition worsened because he'd get further behind compared to the other kids. (AR 383-84). It did not appear that plaintiff was learning anything. (AR 384). Once in a while he would still get panic attacks. (AR 384). He fought with his siblings. (AR 385-86). Plaintiff was "born dead" and had lost a lot of oxygen because he had the cord wrapped around his neck. (AR 387). Other than asthma, plaintiff did not have any physical problems. (AR 387). Plaintiff's doctor wanted to put him on medication for ADHD but he was not on such medication because plaintiff's mother was not sure how it would interact with his asthma medication. (AR 387-88, 391-92). The doctor indicated that she did not know if plaintiff would experience side effects from the combination of ADHD and asthma medication. (AR 392). Plaintiff received home schooling for an hour a day. (AR 388). The teacher left lots of homework. (AR 388). Plaintiff did not have the initiative to do it himself. (AR 388). Plaintiff's mother or brothers had to do it with him. (AR 388-89). Plaintiff would constantly get up and walk around. (AR 389).

### D.    The ALJ's Decision

In his December 28, 2006 decision, the ALJ thoroughly summarized the record, including the medical opinions and evaluations regarding plaintiff's mental impairments and the testimony of plaintiff's mother at the administrative hearing. (AR 28-33). As noted above, the ALJ found that plaintiff was not disabled.

First, the ALJ addressed the impairments which the ALJ determined to constitute severe and non-severe impairments. The ALJ determined that plaintiff had asthma based upon the October 9, 2003 diagnosis of Dr. Oliverio, and that he

had ADHD based upon the May 6, 2006 assessment of reviewing psychiatrist Dr. Paxton. (AR 15). Although the ALJ noted the "paucity" of substantial objective evidence to support the foregoing diagnoses, he assertedly gave plaintiff "generous benefit of the doubt" by finding that such impairments were severe and caused more than minimal limitations in his ability to perform daily activities. (AR 15). However, the ALJ found no evidence that plaintiff had a genuine learning disability which caused him anything more than minimal limitations in his activities of daily living, attributing his lack of appropriate progress in school to plaintiff's ADHD. (AR 15). In making the latter finding, the ALJ expressly considered, among other things, plaintiff's mother's statements, Dr. Linkhart's November 1999 and 2001 reports, Dr. Webb's letter, the assessments of plaintiff's 5th and 6th grade teachers, Dr. Taylor's February 2004 and February 2005 reports, and Dr. Meyer's assessment. The ALJ did not expressly reference Dr. Michaelson's 2004 assessment in this portion of the decision.

Second, the ALJ determined, based upon the opinions of the state agency physicians that plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment. (AR 17).

Third, the ALJ determined that plaintiff did not have an impairment or combination of impairments that functionally equaled a listing. (AR 17). The ALJ engaged in a lengthy discussion of the six domains, considering all symptoms and all opinion evidence. (AR 17-26). Among other things, the ALJ expressly considered plaintiff's mother's statements, plaintiff's own testimony, plaintiff's teacher's assessments, Dr. Taylor's assessments, Dr. Hurwitz's opinion, Dr. Webb's letter, Dr. Michaelson's May 24, 2004 observations, the June 2004 IEP Review in which Dr. Michaelson participated, and Dr. Michaelson's June 2004 report of his May 24, 2004 psychoeducational examination of plaintiff.

Throughout the opinion, the ALJ referenced plaintiff's mother's statements and conduct. (AR 15, 16, 17). The ALJ noted that despite the fact that plaintiff

had not then experienced any exacerbations, emergency room visits, or reported limitations resulting therefrom, within two months of plaintiff being diagnosed with asthma, plaintiff's mother sought a letter from plaintiff's doctor so she could file for disability on his behalf. The ALJ next noted that despite the fact that plaintiff's mother consistently insisted plaintiff had a learning disability, the ALJ found no evidence that plaintiff's learning disability was genuine, causing him any more than minimal limitations in his activities of daily living, and that rather, plaintiff's lack of appropriate progress in school was attributable to his ADHD. (AR 15). The ALJ further pointed out that one of plaintiff's teacher's reported that plaintiff's mother insisted on special education classes, even though it was the opinion of the teacher and specialists that plaintiff's needs were not serious enough to warrant special education classes. (AR 16). The ALJ also noted that despite the fact that plaintiff's mother reportedly kept plaintiff home from school for "any little thing," plaintiff's mother was successful in obtaining home/hospital schooling for plaintiff based upon plaintiff's excessive absences, and without supportive objective medical evidence that there was a medical need to participate in the home schooling program. (AR 19). The ALJ further pointed to the apparent inconsistency between plaintiff's mother's somewhat credible description of plaintiff's behavioral problems and her refusal to place him on ADHD medication based on an asserted fear of interaction with asthma medication not shared by plaintiff's physician, and her failure to seek out logical options to lessen his alleged symptoms, such as psychological and dietary counseling. (AR 19). Although expressly considering plaintiff's mother's statements alleging that plaintiff had a learning disability, the ALJ found "the current opinions of the mental health experts to be most persuasive and conclude[d] he [did] not have a learning disability that would significantly impeded his daily activities." (AR 17).

///

///

# V.    DISCUSSION

Plaintiff alleges that a reversal or remand is appropriate because the ALJ: (1) failed to consider the opinion of Dr. Webb; (2) failed to consider the opinion of Dr. Michaelson; and (3) failed properly to consider the testimony of plaintiff's mother. (Plaintiff's Motion at 1-7). The court addresses and rejects plaintiff's contentions below.

## A.    Standard of Review

Pursuant to 42 U.S.C. section 405(g), a court may set aside a denial of benefits only if it is not supported by substantial evidence or if it is based on legal error. Robbins v. Social Security Administration, 466 F.3d 880, 882 (9th Cir. 2006) (citing Flaten v. Secretary of Health & Human Services, 44 F.3d 1453, 1457 (9th Cir. 1995)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (citations and quotations omitted). It is more than a mere scintilla but less than a preponderance. Robbins, 466 F.3d at 882 (citing Young v. Sullivan, 911 F.2d 180, 183 (9th Cir. 1990)).

To determine whether substantial evidence supports a finding, a court must "'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'" Aukland v. Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001) (quoting Penny v. Sullivan, 2 F.3d 953, 956 (9th Cir. 1993)). If the evidence can reasonably support either affirming or reversing the ALJ's conclusion, a court may not substitute its judgment for that of the ALJ. Robbins, 466 F.3d at 882 (citing Flaten, 44 F.3d at 1457).

## B.    The ALJ Properly Evaluated the Medical Opinion Evidence

Plaintiff contends that the ALJ failed to consider the opinions of treating physician Dr. Webb and school psychologist, Dr. Michaelson, whom the parties characterize as a consultative examining physician. (Plaintiff's Motion at 2-4). ///

20

This court concludes that the ALJ did not materially err in his consideration of such opinions.

### 1. Pertinent Law

In Social Security cases, courts employ a hierarchy of deference to medical opinions depending on the nature of the services provided. Courts distinguish among the opinions of three types of physicians: those who treat the claimant ("treating physicians") and two categories of "nontreating physicians," namely those who examine but do not treat the claimant ("examining physicians") and those who neither examine nor treat the claimant ("nonexamining physicians"). Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996) (footnote reference omitted). A treating physician's opinion is entitled to more weight than an examining physician's opinion, and an examining physician's opinion is entitled to more weight than a nonexamining physician's opinion.[8] See id. In general, the opinion of a treating physician is entitled to greater weight than that of a non-treating physician because the treating physician "is employed to cure and has a greater opportunity to know and observe the patient as an individual." Morgan v. Commissioner of Social Security Administration, 169 F.3d 595, 600 (9th Cir. 1999) (citing Sprague v. Bowen, 812 F.2d 1226, 1230 (9th Cir. 1987)).

The treating physician's opinion is not, however, necessarily conclusive as to either a physical condition or the ultimate issue of disability. Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989) (citing Rodriguez v. Bowen, 876 F.2d 759, 761-62 & n.7 (9th Cir. 1989)). Where a treating physician's opinion is not contradicted by another doctor, it may be rejected only for clear and convincing reasons. Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007) (citation and internal

---

[8] Cf. Le v. Astrue, 529 F.3d 1200, 1201-02 (9th Cir. 2008) (not necessary or practical to draw bright line distinguishing treating physicians from non-treating physicians; relationship is better viewed as series of points on a continuum reflecting the duration of the treatment relationship and frequency and nature of the contact) (citation omitted).

quotations omitted).  The ALJ can reject the opinion of a treating physician in favor of a conflicting opinion of another examining physician if the ALJ makes findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record.  Id. (citation and internal quotations omitted); Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002) (ALJ can meet burden by setting out detailed and thorough summary of facts and conflicting clinical evidence, stating his interpretation thereof, and making findings) (citations and quotations omitted); Magallanes, 881 F.2d at 751, 755 (same; ALJ need not recite "magic words" to reject a treating physician opinion – court may draw specific and legitimate inferences from ALJ's opinion).  "The ALJ must do more than offer his conclusions."  Embrey v. Bowen, 849 F.2d 418, 421-22 (9th Cir. 1988).  "He must set forth his own interpretations and explain why they, rather than the [physician's], are correct."  Id.  "Broad and vague" reasons for rejecting the treating physician's opinion do not suffice.  McAllister v. Sullivan, 888 F.2d 599, 602 (9th Cir. 1989).

The foregoing standards also apply to opinions of examining physicians. See Andrews v. Shalala, 53 F.3d 1035, 1042-44 (9th Cir. 1995).

**2.    ALJ's Assessment of Dr. Webb's Opinion**

Plaintiff asserts that the ALJ failed to consider and disregarded the opinion of treating physician, Dr. Webb.  (Plaintiff's Motion at 4-5) (citing AR 291). Defendant disagrees, noting that the ALJ specifically referenced Dr. Webb's opinion in his decision and properly explained his reasons for rejecting such opinion.  (Defendant's Motion at 6-7) (citing AR 15-16, 291).  This Court agrees with defendant.

The ALJ twice specifically referenced Dr. Webb's opinion in his decision. (AR 15-16, 18).  For example, the ALJ expressly noted that Dr. Webb said that plaintiff exhibited most of the behaviors of ADHD.  (AR 18).  The ALJ further

///

specifically explained his reasons for rejecting Dr. Webb's disability
determination, stating:

> The claimant's mother was able to obtain a letter from H.R. Webb,
> Jr., M.D. on November 7, 2003, in which the doctor diagnosed the
> claimant with a learning disability with a guarded to poor prognosis,
> and the doctor claimed it severely 'disabled' him (Exhibit 8F, p.21
> and duplicate at 17F, p.1 [AR 291, 363]).  However, I do not find Dr.
> Webb's opinion to be persuasive or supported by evidence.  Dr. Webb
> is not a mental health provider, but, according to the Directory of
> Physicians in the United States, a general practitioner with a
> secondary specialization in radiation oncology, who currently is
> (temporarily) out of practice.  While the opinions from treating and
> examining sources are considered, the final responsibility for
> determining the issues of disability is reserved for the Social Security
> Administration . . . .

(AR 15-16) (citations omitted).  As the ALJ rejected Dr. Webb's opinion in favor
of the conflicting opinion of Dr. Taylor, another examining physician, the ALJ
need only have set forth specific, legitimate reasons for doing so that are based on
substantial evidence in the record.   The ALJ did so here.

First, the ALJ correctly noted that Dr. Webb's opinion is unsupported.  The
record is bereft of any treatment notes by Dr. Webb to support the conclusions
contained in his brief and conclusory letter.  See Batson v. Commissioner of
Social Security Administration, 359 F.3d 1190, 1195 (2004) (ALJ may discredit
treating physicians' opinions that are conclusory, brief, and unsupported by record
as a whole or by objective medical findings); Connett v. Barnhart, 340 F.3d 871,
875 (9th Cir. 2003) (treating physician's opinion properly rejected where treating
physician's treatment notes "provide no basis for the functional restrictions he

23

opined should be imposed on [the claimant]"); <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1149 (9th Cir. 2001) (ALJ need not accept treating physician's opinion if it is conclusory and brief and unsupported by treatment notes or clinical observations).

Second, the ALJ could properly consider Dr. Webb's area of specialty in assessing the weight to give to his opinion regarding plaintiff's mental health. <u>See</u> 20 C.F.R. § 416.927(d)(5). The fact that Dr. Webb is not a mental health specialist, constitutes a specific and legitimate reasons to discount his opinion in favor of that of Dr. Taylor.

Third, the ALJ also properly gave little weight to Dr. Webb's conclusion that plaintiff was disabled as such a determination was reserved for the ALJ. <u>Magallanes</u>, 881 F.2d at 751.

Finally, it is reasonable to infer from the ALJ's decision that he rejected Dr. Webb's opinion in favor of the conflicting assessment of Dr. Taylor. When, like here, the opinion of an examining physician such as Dr. Taylor is properly supported, it may constitute substantial evidence upon which an ALJ may rely to reject a treating physician's opinion. <u>See</u>, <u>e.g.</u>, <u>Tonapetyan</u>, 242 F.3d at 1149 (consultative examiner's opinion on its own constituted substantial evidence, because it rested on independent examination of claimant). Where a conflict exists between the assessment of an examining physician based on objective clinical findings and the assessment of a treating physician, the examining physician's opinion may itself constitute substantial evidence warranting rejection of the treating doctor's opinion, and it is the sole province of the ALJ to resolve the conflict. <u>Andrews</u>, 53 F.3d at 1041.

Accordingly, the ALJ's rejection of Dr. Webb's opinion is supported by substantial evidence and is free from material error.

///

///

24

### 3. ALJ's Assessment of Dr. Michaelson's May 2004 Evaluation

Plaintiff asserts that the ALJ ignored the May 2004 opinions of Dr. Michaelson – a school psychologist who examined plaintiff. (Plaintiff's Motion at 2-5) (citing AR 291). Defendant disagrees, noting that the ALJ specifically referenced and accounted for Dr. Michaelson's opinions in his decision. (Defendant's Motion at 2-5) (citing AR 18, 19, 22, 272, 296-97, 306). This Court finds no material error in the ALJ's assessment of Dr. Michaelson's May 2004 opinions.

First, as noted above, the ALJ expressly discussed Dr. Michaelson's opinions. (AR 18, 19, 22). Thus, contrary to plaintiff's suggestion, it is clear that the ALJ did not ignore such opinions and, to some degree adopted them. (AR 18, 19, 22).

Second, to the extent the ALJ's determination is consistent with such opinion, as detailed in Defendant's Motion, he was not required to give reasons to reject such opinion. See Meanfel v. Apfel, 172 F.3d 1111, 1114 (9th Cir. 1999).

Third, to the extent Dr. Michaelson's opinions are inconsistent with the ALJ's disability determination, this Court finds no material error in the ALJ's consideration of such opinion. The ALJ expressly stated that he found the current opinions of the mental health experts to be most persuasive. (AR 17). An ALJ may properly favor more recent reports/opinions over older reports/opinions. See e.g., Stone v. Heckler, 761 F.2d 530, 532 (9th Cir.1985) (earlier medical evaluations, based on claimant's condition several months before, do not constitute substantial evidence to rebut the conclusions of a later report). Drs. Taylor, Hurwitz and Paxton provided the most recent mental health expert opinions and their opinions were consistent with one another and were expressly adopted by the ALJ. Thus, although the ALJ did not expressly state that he was favoring their opinions over that of Dr. Michaelson based upon their recency, such

25

1    a conclusion can be inferred from the ALJ's thorough analysis of the pertinent

2    facts and evidence, and findings regarding conflicts in the medical evidence.

3    Magallanes, 881 F.2d at 755 (court may draw "specific and legitimate inferences

4    from the ALJ's opinion").

5         Accordingly, a reversal or remand is not appropriate based upon the ALJ's

6    alleged failure to consider Dr. Michaelson's opinions.

7              **C.    The ALJ Properly Evaluated the Testimony of Plaintiff's Mother**

8         Plaintiff asserts that this matter must be remanded because the ALJ did not

9    properly consider plaintiff's mother's testimony regarding plaintiff's problems

10   with learning.  (Plaintiff's Motion at 5-7).  This Court disagrees.

11        Plaintiff's mother's statements and testimony essentially constitute lay

12   evidence of plaintiff's asserted disability.  Lay testimony as to a claimant's

13   symptoms is competent evidence that an ALJ must take into account, unless he

14   expressly determines to disregard such testimony and gives reasons germane to

15   each witness for doing so.  Stout, 454 F.3d at 1056 (citations omitted); Lewis v.

16   Apfel, 236 F.3d 503, 511 (9th Cir. 2001); see also Robbins, 466 F.3d at 885 (ALJ

17   required to account for all lay witness testimony in discussion of findings)

18   (citation omitted); Regennitter v. Commissioner of Social Security Administration,

19   166 F.3d 1294, 1298 (9th Cir. 1999) (testimony by lay witness who has observed

20   claimant is important source of information about claimant's impairments).

21        Here, the ALJ provided germane reasons to disregard plaintiff's mother's

22   statements and testimony.  As noted above, among other things, the ALJ pointed

23   to the apparent inconsistency between plaintiff's mother's somewhat credible

24   description of plaintiff's behavioral problems and her refusal to place him on

25   ADHD medication based on an asserted fear of interaction with asthma medication

26   not shared by plaintiff's physician, and her failure to seek out logical options to

27   lessen his alleged symptoms, such as psychological and dietary counseling.  (AR

28   19).  In assessing credibility, the ALJ may properly rely on the unexplained failure

26

to request treatment consistent with the alleged severity of the her symptoms. Bunnell v. Sullivan, 947 F.2d 341, 346 (9th Cir. 1991) (en banc); Meanel, 172 F.3d at 1114. The ALJ also properly discounted plaintiff's mother's statements based upon inconsistencies between plaintiff's mother's assessments and those of plaintiff's teachers and specialists. (AR 16).

As the ALJ discounted plaintiff's mother's statements based on germane reasons supported by substantial evidence in the record, plaintiff is not entitled to a remand on this basis.

**VI.    CONCLUSION**

For the foregoing reasons, the decision of the Commissioner of Social Security is affirmed.

LET JUDGMENT BE ENTERED ACCORDINGLY.

DATED: January 4, 2010

_____/s/_____
Honorable Jacqueline Chooljian
UNITED STATES MAGISTRATE JUDGE